**STUDENT PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC., and Friends of the Earth, Plaintiffs,**

v.

**FRITZSCHE, DODGE & OLCOTT, INC., Defendant.**

### Civ. A. No. 83–1605.

United States District Court,
D. New Jersey.

Feb. 14, 1984.

Terris & Sunderland by Bruce J. Terris, Carolyn A. Smith, Washington, D.C., Michael Gordon, Montclair, N.J., and Kathleen Butler, New York City, for plaintiffs.

McCarter & English by Joseph E. Irenas, Sara B. Goodman, Newark, N.J., for defendant.

## OPINION

STERN, District Judge.

In this "citizens' suit", brought pursuant to section 505 of the Federal Water Pollution Control Act (the Act), 33 U.S.C. § 1365 (1976),[1] plaintiffs Student Public Interest Research Group of New Jersey, Inc. and Friends of the Earth seek declaratory and injunctive relief, as well as the imposition of civil penalties, costs and fees, as a result of alleged violations by defendant Fritzsche, Dodge & Olcott, Inc. (FDO) of permits authorizing the discharge of cer-

---

1. The Federal Water Pollution Control Act dates back to 1948, but takes its present form as a result of comprehensive amendments by Congress in 1972, and is alternatively known as the Clean Water Act.

tain pollutants from defendant's operation into the Passaic River. Defendant moves to dismiss the complaint on two grounds: first, that a citizen's suit can not be maintained due to the "diligent prosecution" by the Environmental Protection Agency (EPA) in this matter, as reflected in the recent administrative consent order entered into between the EPA and FDO; and second, that the doctrine of primary jurisdiction compels the Court to forego decision pending the EPA's forthcoming decision on defendant's permit renewal application. Plaintiffs cross-move for summary judgment on the issue of liability, and seek additional discovery, and eventually a hearing, on the issue of damages.

Oral argument on these cross-motions was initially scheduled for September 12, 1983. On that date, the Court related to the parties that, unless there was objection, it would adjourn oral argument for a reasonable period in order to invite the EPA to participate in this lawsuit. No objections to this proposed solicitation were voiced, and on September 12, the Court wrote to Ms. Jacqueline Shafer, Regional Administrator of the EPA, and advised her of the status of the case. The Court noted that one of plaintiffs' principal arguments in opposition to defendant's motion to dismiss was that the EPA's enforcement activities with respect to defendant had not been "diligent"; in particular, plaintiffs alleged that the administrative consent order was itself invalid. The Court requested the EPA to indicate to the Court within fifteen days if it desired to participate in this case. The EPA replied that it would submit a synopsis of the administrative history of its dealings with defendant, which it did on October 28, 1983. This summary, which was submitted with a considerable number of exhibits, does not directly address any of the arguments raised by the present motions, but rather tracks the nearly nine year history of the interchanges between the EPA and FDO. Having received this submission, along with additional briefings by the parties, the Court heard oral argu-

ment on December 19, 1983. We now deny defendant's motion to dismiss, and grant plaintiffs' motion for partial summary judgment.

## FACTS

Defendant manufactures fragrances and flavors used in food and cosmetic products at a facility located in East Hanover, New Jersey. On April 19, 1974, the EPA's Regional Administrator issued to defendant a National Pollutant Discharge Elimination System (NPDES) permit for the direct discharge of pollutants from defendant's factory into the Passaic River; the permit became effective on April 30, 1974, and had an expiration date of April 30, 1979.[2] The NPDES permit was issued in accordance with section 402 of the Act, 33 U.S.C. § 1342, a provision included in the Clean Water Act Amendments of 1972, and which, in conjunction with the other additions to the Act, reflects and implements a new theory of water pollution control and enforcement.

Prior to 1972, the focus of water pollution legislation was on containing pollution through water quality standards; subsequent to 1972, the emphasis is placed on controlling pollutant discharge through "effluent limitations," rather than on the quality of the receiving water. To achieve the national goals of the Act, including elimination of all pollutant discharge into navigable waters by 1985, *see* 33 U.S.C. § 1251(a), the 1972 amendments require that a direct discharger, such as defendant, adopt "best practicable control technology currently available" (BPT) by July 1, 1977, and "best available technology economically achievable" (BAT) by July 1, 1983–1987, depending on the category and class of point source. *See* 33 U.S.C. § 1311(b). Both of these statutory guidelines are to be defined by regulations issued by the EPA Administrator. *See* 33 U.S.C. §§ 1311(b), 1314(b), 1314(d); *National Association of Metal Finishers v. EPA*, 719 F.2d 624, 633–34 (3d Cir.1983).

**2.** The following facts are drawn largely from the EPA's summary of the administrative history of enforcement, but that version does not materially differ from the facts presented by the parties. Where any discrepancy exists, we will note it.

The basic mechanism for enforcing the effluent and water quality standards applicable to direct dischargers is the NPDES, a permit system whose function is to define the discharger's obligations under the Act by translating the national effluent standards into limitations designed for the discharger's particular operation. As explained in *EPA v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976) (citing 33 U.S.C. §§ 1319, 1365), "An NPDES permit serves to transform generally applicable effluent limitations and other standards ... into the obligations (including a timetable for compliance) of the individual discharger, and the Amendments provide for direct administrative and judicial enforcement of permits." *Accord EPA v. National Crushed Stone Association*, 449 U.S. 64, 69–72, 101 S.Ct. 295, 299–301, 66 L.Ed.2d 268 (1980). Thus, with few exceptions, a discharger in compliance with the terms and conditions of an NPDES permit is deemed to be in compliance with those sections of the Amendments on which the permit conditions are based. *State Water Resources Control Board*, 426 U.S. at 205, 96 S.Ct. at 2025 (citing 33 U.S.C. § 1342(k)); *see* Zener, The Federal Law of Water Pollution Control, in Federal Environmental Law (Dolgin & Guilbert, eds. 1974), 728. Finally, under the Act, a discharger operating under an NPDES permit must establish and maintain records, install, use and maintain monitoring equipment, sample effluents, and report the results to the EPA, *see* 33 U.S.C. § 1318—in short, a discharger must report its own permit violations should they occur.

Subsequent to the issuance of defendant's NPDES permit in April, 1974, FDO's activities changed somewhat, causing violations of the biological oxygen demand ($BOD_5$) and temperature limits set forth in its permit. In January, 1975, defendant sought a permit modification, which, after roughly twenty months of information gathering, was granted by the EPA in October, 1976. This modification included a compliance schedule which required the installation of a treatment system by July 1, 1977. This treatment system did not, in fact, become operational until May, 1979. *See* Heiart Affidavit, ¶ 4.[3] On January 16, 1977, defendant requested an extension of the July 1, 1977 statutory deadline for BPT compliance, pursuant to 33 U.S.C. § 1319(a)(5)(B), but this request was denied by the EPA in a letter dated May 23, 1978. Finding that prior delays by defendant had not been justified, the EPA wrote that FDO had not satisfied the "good faith condition" of section 1319(a)(5)(B).[4]

On September 13, 1977, the EPA, citing violations of the compliance schedule in defendant's NPDES permit, issued an administrative order to show cause why the matter should not be referred for civil prosecution. After meeting with representatives of FDO, the EPA determined that referral of the case to the Department of Justice was not warranted.

The EPA issued a renewal permit to defendant on June 6, 1979, which became effective on June 30, 1979. Because at the time of the permit issuance the EPA had not promulgated effluent limitation guidelines for the organic chemicals industry, of which defendant is a part, the permit limitations were based on the "best professional judgment" of the permit writer and the projected performance of the newly operational treatment system.[5] The renewal

3. A slight discrepancy exists between the Heiart Affidavit, submitted by defendant, and the EPA's administrative history concerning this date. The latter report suggests that the system was in operation by sometime in 1978. The actual date is of no consequence to today's decision.

4. Section 1319(a)(5)(B) allows the Administrator to grant an extension to a violator who has acted in good faith, and who has made a commitment to achieve compliance by the earliest possible date after July 1, 1977, but in no case later than April 1, 1979.

5. Plaintiff refers to this standard in its papers as "best engineering judgment" based effluent limitations. Regardless of nomenclature, neither side disputes that the permit is fully enforceable. *See generally United States v. Velsicol Chemical Corp.*, 438 F.Supp. 945 (W.D.Tenn. 1976) (citing *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692 (D.C.Cir.1974) (permits containing conditions and limitations de-

permit expired on June 30, 1981.[6]

Beginning some time in 1981, the EPA noted intermittent non-compliance with permit limitations for total suspended solids (TSS), which, despite defendant's control strategies, continued into 1982. On September 30, 1982, the EPA issued another administrative order which cited the numerous TSS violations and directed defendant to appear on November 29, 1982, to show cause why the EPA should not refer the case to the Department of Justice for imposition of penalties pursuant to 33 U.S.C. § 1319. FDO responded on November 16, 1982, submitting a report to the EPA documenting its efforts to control the TSS problem and seeking an adjournment of the November 29 enforcement conference. This conference was adjourned pending EPA evaluation of the latest discharge monitoring report. The EPA received this report on March 1, 1983; after review by the case engineer, the case attorney wrote to defendant on March 15, 1983, informing FDO that the recent data revealed continuing TSS violations, and scheduling a conference for April.

During the course of these latter exchanges between the EPA and FDO, plaintiffs notified both of these parties, as well as the New Jersey Department of Environmental Protection (NJDEP), that it intended to commence an action against defendant for violations of its permit. The letters, dated March 4, 1983, were sent to satisfy the requirement that the EPA Administrator, the State, and the alleged violator be given at least sixty days notice of a "citizen's suit". See 33 U.S.C. § 1365(b)(1). By letter dated April 29, 1983, FDO wrote to plaintiffs in response to the latter's correspondence, and reviewed the measures FDO had taken to correct temperature and TSS violations. Also discussed in this letter were the EPA's enforcement efforts, which had culminated in a conference between the parties on April 20, 1983. Defendant reported that at this meeting, FDO agreed to "hook into" a municipal sewer system, then under construction in East Hanover, New Jersey, and to be completed within eighteen months. Defendant concluded, "Once the hookup is completed, the intermittent problems experienced by FDO will be completely eliminated. In the meantime, FDO also agreed to investigate and to report on reasonable interim steps to be taken to deal with the occasional problems with the TSS levels. The foregoing agreement will be embodied in an administrative consent order which is currently being drafted by an EPA staff attorney." Second Smith Aff., Exh. 1.

On May 4, 1983, plaintiffs filed this suit alleging that defendant, as a result of its numerous permit violations, was in contravention of sections 301(a) and 402 of the Act, 33 U.S.C. §§ 1311(a) and 1342. Basing their claim on defendant's own discharge monitoring reports (DMR's) and non-compliance reports (NCR's), plaintiffs assert that since May, 1980, defendant violated its effluent limitations for $BOD_5$ 3 times, for temperature 58 times, and for TSS 179 times. See Complaint, ¶ 16; Plaintiff's Brief in Support of its Motion for Partial Summary Judgment, 17; First Smith Aff., ¶ 2.

After filing suit, plaintiffs wrote to the EPA's Regional Administrator and FDO's counsel on May 26, 1983, requesting that they be allowed to participate in any negotiation between the EPA and FDO concerning the latter's compliance with its NPDES permit. Plaintiffs raised several arguments that cast doubt on the legality of the proposed administrative consent order, as described in defendant's letter to plaintiffs of April 29, 1983, and emphasized that the underlying policies of the Act supported participation by citizens groups. Second Smith Aff., Exh. 2. Plaintiffs state, and

termined to be necessary to carry out objectives of the Act prior to promulgation of national standards are enforceable); Zener, The Federal Law of Water Pollution Control, in Federal Environmental Law (Dolgin & Guilbert, eds. 1974), 729–30.

6. In April, 1982, the EPA authorized the New Jersey Department of Environmental Protection to issue NPDES/NJPDES permits. See 33 U.S.C. § 1342(b). The terms of defendant's permit remain unchanged.

defendant does not dispute, that the EPA never responded to this written request.

On December 7, 1983, defendant informed the Court that a final administrative consent order between the EPA and FDO had recently been signed, formally resolving the problem of defendant's noncompliance with its NPDES permit. The consent order notes that FDO "informed both the EPA and NJDEP that at this time it intends to discharge its process wastewater to the East Hanover collections system by December 31, 1984 or as soon as the sewer lines are made available", and orders as follows:

> The permittee [FDO] shall comply with the following schedule to achieve compliance with its effluent discharge limitations:
>
> 1. By August 20, 1983, complete and submit to the EPA and NJDEP, a report detailing all actions instituted by the permittee to attain compliance with the TSS permit limitations, and the alternative interim actions the permittee can reasonably implement in the period prior to ceasing its wastewater discharge, except for the discharge of its noncontact cooling water, to the Passaic River in order to achieve the TSS permit limitations or to minimize violations of same.
>
> 2. By December 31, 1984, complete the implementations of a long term control strategy and comply with permit effluent limitations for TSS.

The consent order requires FDO to submit quarterly progress reports, and states that, "The permittee shall exercise its best efforts to implement an interim alternative, minimize incidents of non-compliance and achieve compliance with the TSS permit limitations as expeditiously as possible." The consent order took effect on November 25, 1983.[7]

## DISCUSSION

### A. Defendant's Motion to Dismiss

Defendant contends that plaintiffs' citizen's suit may not go forward for two reasons: first, because the diligent enforcement activity of the EPA precludes a citizen's suit as a matter of statutory construction; and second, because the existence of defendant's pending renewal application compels the Court to refrain from acting as a matter of agency primary jurisdiction. We find neither argument convincing.

### 1. The EPA's Enforcement Activity as a Bar to a Citizen's Suit

Section 505 of the Act, 33 U.S.C. § 1365, which authorizes citizen's suits, conditions the right to sue on the absence of diligent prosecution of violations by the EPA Administrator or the State. Subsection (b)(1)(B) states:

> No action may be commenced—
>
> if the Administrator or State has commenced *and is diligently prosecuting* a civil or criminal action *in a court* of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

33 U.S.C. § 1365(b)(1)(B) (emphasis added). Defendant maintains that the EPA's enforcement activity, culminating in the administrative consent order, has been "diligent", and therefore preempts plaintiff's right to sue. Plaintiff counters that the EPA's actions have been neither "diligent" nor "in a court." We address these issues in reverse order.

### a. Has the EPA's enforcement activity been "in a court"?

■ Since *Baughman v. Bradford Coal Co.*, 592 F.2d 215 (3d Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), we know that the phrase "in a court" need not be read literally. In *Baughman*, the court recognized that a governmental agency—in this case, the Pennsylvania Department of Environmental Resources—could, in certain circumstances, be deemed to be "a court", if "its powers and characteristics make such a classification necessary to achieve statutory goals." *Id.* at 217. The *Baughman*

---

7. The text of the Administrative Consent Order is produced in the Appendix to this Opinion.

court concluded that, "for a State administrative board to be a 'court' . . ., that tribunal must be empowered to grant relief which will provide meaningful and effective enforcement of an implementation plan." *Id.* at 218.[8] In a thoughtful extension of *Baughman*'s reasoning, the court in *Gardeski v. Colonial Sand & Stone Co.*, 501 F.Supp. 1159, 1163 (S.D.N.Y.1980), explained that a citizen's suit may be precluded even in the absence of a proceeding before any tribunal:

> A court suit may be unnecessary, for example, because an administrative proceeding has resulted in an enforceable consent judgment; or because an administrative proceeding is underway that may result in substantially the same relief that could be obtained from a court . . . . [I]f the agency is diligent in prosecuting violations the State and its agency may be at least as effective in achieving results as a citizen in the judicial process.

The *Gardeski* court rejected the view that a state agency or the EPA must always commence a court action, despite the success of more informal administrative proceedings, in order to retain control over enforcement of environmental standards.

Plaintiffs' position that the EPA is not "a court" has a good deal of merit. While the Act delegates authority to the EPA to promulgate regulations and oversee the NPDES system, the EPA possesses no powers of its own to compel compliance by a polluter. Instead, the EPA Administrator is authorized by the Act to commence a civil action in a federal district court for appropriate relief for any violation for which he is authorized to issue a compliance order. 33 U.S.C. § 1319(b), (a). Thus,

it is possible that sections 1365(b)(1)(B) and 1319(b), read together, require the EPA to effectuate enforcement through court action in order to preclude a citizen's suit;[9] *Baughman*'s expansion of "court" would therefore encompass only state agencies possessing enforcement powers of their own. *See, e.g., Gardeski*, 501 F.Supp. at 1163 (state agency did possess sufficient powers to compel compliance, and would be considered "a court").

There is also a certain power in defendant's argument that the EPA should be treated as "a court," for it is imaginable that in some situations disputes may be resolved more efficiently and as effectively without the scaffolding of the federal judiciary. To require the EPA to effect compliance in all cases by court actions, even where another forum might be as good, simply to prevent a separate lawsuit, may be a wasteful construction of the Act, particularly in light of *Baughman* and *Gardeski*. Defendant's interpretation is strengthened by the fact that, in the event that nonjudicial proceedings invoked by the EPA break down, the EPA is always in a position to file a civil action for enforcement.

Having elicited the positions, we will not now decide whether the EPA is a "court" for the purposes of section 505(b)(1)(B). Although tempted to adopt plaintiff's interpretation as more consistent with the Act's language, it is enough for today to hold that where the EPA fails to allow participation by citizen groups in its enforcement proceedings it will not be accorded "court" status.[10] Because in this case the EPA rebuffed plaintiffs' requests to participate in the negotiations between the EPA and

---

**8.** In *Baughman*, the court was construing section 304(b)(1)(B) of the Clean Air Act, 42 U.S.C. § 7604(b)(1)(B), but, as the court itself noted, the corresponding provision in the Clean Water Act is identical. *See Baughman*, 592 F.2d at 217.

**9.** In any such action in a federal court, a citizen may intervene as a matter of right. 33 U.S.C. § 1365(b)(1)(B).

**10.** In *Baughman*, the court noted that the existence or absence of a right to intervene could properly be considered one factor in deciding

whether a particular state agency or tribunal is a "court", but explicitly declined to decide whether the absence of such a right of participation would alone divest that agency or tribunal of "court" status. *Baughman*, 592 F.2d at 219 & n. 5; *see also Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Co.*, No. 83–2040 (D.N.J. Nov. 18, 1983) (bench decision) (lack of intervention opportunity considered in decision to allow citizen's suit); *Love v. New York State Department of Environmental Conservation*, 529 F.Supp. 832 (S.D.N.Y.1981) (same).

defendant, we will not treat the EPA as a "court."[11]

Our decision is based on the notion that public participation in enforcement actions promotes the goals of the Act, as well as administrative efficiency. Responsible citizen groups, concerned with the quality of our environment, and willing to contribute to its betterment, perform a public service in their efforts to enforce the Clean Water Act. *See* Federal Water Pollution Control Act Amendments of 1972, S.Rep. No. 414, 92d Cong., 1st Sess. 81, *reprinted in* 1972 U.S.Code Cong. & Ad.News 3668, 3747. Congress was well aware that

> [a] high degree of informed public participation in the control process is essential to the accomplishment of the objectives we seek—a restored and protected natural environment.
>
> Section 101(d) is included because the Committee recognizes that the manner in which these measures are implemented will depend, to a great extent, upon the pressures and persistence which an interested public can exert upon the governmental process.
>
> The Environmental Protection Agency and the State should actively seek, encourage and assist the involvement and participation of the public in the process of setting water quality requirements and in their subsequent implementation and enforcement.

*Id.* at 12, U.S.Code Cong. & Admin.News, p. 3679. Courts have amplified Congress' concern in recognizing that citizen groups are "not to be treated as nuisances or troublemakers but rather as welcomed participants in the vindication of environmental interests." *Friends of the Earth v. Carey*, 535 F.2d 165, 172 (2d Cir.1976) (referring to section 304 of the Clean Air Act, 42 U.S.C. § 7604, the equivalent of section 505 of the Clean Water Act), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). Quite clearly Congress envisioned

public participation in protecting the environment not merely at the level of a citizen's lawsuit. Indeed, by encouraging such involvement at, for example, the negotiation stage, the need for a formal suit under section 505 may often be averted. While we obviously have no authority to compel the EPA to allow citizen groups to intervene in proceedings not before the Court, we hold that where the EPA refuses to allow public participation in its enforcement activities, such activities will be found to be *not* "in a court." *See Sierra Club v. SCM Corp.*, 572 F.Supp. 828 (W.D.N.Y. 1983) (citizen's suit may be entertained where citizens group lacked opportunity to participate in state agency enforcement proceedings resulting in consent order).

*b. Has the EPA's enforcement action been "diligent"?*

Although our determination that the inability of plaintiff to intervene in the EPA's enforcement proceedings deprives those proceedings of "court" status independently disposes of defendant's motion to dismiss, we will consider as an alternative ground for decision plaintiff's argument that it is not precluded from suit because the EPA's actions have not been "diligent" within the meaning of section 505(b)(1)(B).

While little or no judicial guidance exists as to what constitutes diligent prosecution, *see Sierra Club*, 572 F.Supp. at 831 n. 3 (quoting *Gardeski*, 501 F.Supp. at 1164), the legislative history of the Clean Water Act informs us that in making this determination we must consider the citizen's complaint of lack of diligence "against the background of the agency action." S.Rep. No. 414, 92d Cong., 1st Sess. 80, *reprinted in* 1972 U.S.Code Cong. & Ad.News 3668, 3746. In deciding whether the EPA has satisfied this mandate, it is necessary to consider the full context of the agency's actions. An evaluation of "diligence" measures comprehensively the process and effects of agency prosecution.

---

**11.** While counsel for defendant contended at oral argument that the EPA was at all times "totally open" to plaintiffs' attendance at negotiations, and suggested that plaintiff was "deliberately keeping away" from the EPA, *see* Transcript of December 19, 1983, 2–6, we conclude otherwise. Defendant does not and cannot rebut the fact that plaintiff wrote to the EPA, explicitly requesting to participate in the ongoing discussions between the EPA and defendant, and that this request was ignored.

■ Plaintiffs first argue that a review of the chronology of the EPA's actions in this case reveals that the EPA took serious action against defendant only after plaintiffs notified the parties of their intention to sue, and that this demonstrates an absence of diligent EPA prosecution. Even assuming that plaintiffs were the catalyst for the EPA's revitalization, however, this, in itself, does not establish neglect. The notice requirement of section 505, 33 U.S.C. § 1365(b)(1)(A), would seem to contemplate that in some instances citizen's groups might instigate swifter prosecution by the EPA, and the legislative history bears this out. *See id.* at 79, U.S.Code Cong. & Admin.News, p. 3745, (notice requirement designed "to further encourage and provide for agency enforcement"). If the EPA's actions have been otherwise vigorous, we will not investigate the source of this action.

■ A separate argument raised by plaintiffs is that the administrative consent order, the culmination of the EPA's prosecution of defendant, is deficient in that it authorized a compliance procedure not allowed by the Act. The administrative consent order requires that defendant complete the implementation of a long term control strategy and comply with permit effluent limitations for TSS by December 31, 1984. While no specific control strategy is required, the consent order does include a prefatory "Whereas" clause which states that defendant has informed the EPA and NJPED that "at this time it intends to discharge its process wastewater to the East Hanover collection system by December 31, 1984 or as soon as the sewer lines are made available." Plaintiffs argue that the clear terms of the consent order impermissibly extend defendant's deadline for BPT compliance from July 1, 1977 to December 31, 1984, regardless of whether defendant is required to tie-in to the publicly operated treatment works (POTW) located at East Hanover. We concur with plaintiffs.

It is clear that, as a general matter, the EPA is without authority to extend the Act's July 1, 1977 deadline for compliance with BPT (or, in this case, "best professional judgment") based effluent limitations as set out in the discharger's NPDES permit. *Bethlehem Steel Corp. v. Train*, 544 F.2d 657, 663 (3d Cir.1976) *cert. denied*, 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 369 (1977); *accord United States Steel Corp. v. Train*, 556 F.2d 822, 847 (7th Cir.1977) (no hardship extension). If the December 31, 1984 deadline in the consent order corresponds only to defendant's "best efforts" to comply with its permit, this provision plainly runs afoul of this proscription. To the extent that the consent order's timetable is conditioned on defendant tying in to the East Hanover POTW, the December 31, 1984 compliance extension is still unauthorized. While the Act contains two exceptions to the July 1, 1977 deadline where a non-complying direct discharger seeks to bring itself into compliance by connecting to a POTW system, plaintiff correctly points out that defendant cannot meet the specific terms of either of these provisions.

First, section 1311(i)(2)(A) allows certain extensions where the discharger seeks to tie in to a POTW, but subject to a number of prerequisites, the most important of which is that a contract between the direct discharger and the POTW be in existence before July 1, 1977. In this case, such a contract did not exist before July 1, 1977. Second, section 1319(a)(6) states:

Whenever, on the basis of information available to him, the Administrator finds (a) that any person is in violation of section 1311(b)(1)(A) or (C) of this title, (b) that such person cannot meet the requirements for a time extension under section 1311(i)(2) of this title, and (c) that the most expeditious and appropriate means of compliance with this chapter by such person is to discharge into a publicly owned treatment works, then, upon request of such person, the Administrator may issue an order requiring such person to comply with this chapter at the earliest date practicable, *but not later than July 1, 1983*, by discharging into a publicly owned treatment works if such

works concur with such order. Such order shall include a schedule of compliance.

33 U.S.C. § 1319(a)(6) (emphasis added). Despite the fact that the consent order permits compliance well beyond July 1, 1983, defendant states that plaintiffs' interpretation of the Act would disallow any discharger from tying into a POTW after July 1, 1977, even where the POTW did not exist prior to that date. Such an interpretation, according to defendant, "would effectively circumvent the purpose of the act." Def's Reply Brief at 6. Defendant, though, misstates the argument. Plaintiffs do not claim, nor does section 1319(a)(6) posit, that no discharger can be permitted to tie into a POTW after 1977. The argument is simply that the clear statutory language only permits an extension on the basis of such a tie-in to a POTW to July 1, 1983. We cannot conclude that adherence to strict statutory deadlines leads to circumvention of the Act's purposes, particularly where "Congress anticipated that the BPT regulations 'would cause economic hardship and plant closings' because they would impose 'a substantial number of point sources' within each industrial category additional costs which 'must be borne or the point source eliminated.' " *National Association of Metal Finishers*, 719 F.2d 624, 663 (quoting *National Crushed Stone Association*, 449 U.S. at 75–78, 101 S.Ct. at 302–304.

We find that the EPA's actions with respect to defendant have not been diligent. Where the embodiment of the EPA's efforts—the administrative consent order—is itself invalid in its attempt to extend impermissibly the Act's compliance deadlines, we can come to no other conclusion. Defendant's motion to dismiss on the basis of section 505(b)(1)(B) will be denied.

### 2. The Renewal Application as a Bar to a Citizen's Suit

■ On July 1, 1981, defendant filed a NPDES permit renewal application, in which FDO seeks an increase in its allowed TSS levels. The EPA has not yet rendered a decision on defendant's application. Defendant now claims that the citizen's suit should be stayed pending the EPA's decision on its application, on the grounds that the EPA has primary jurisdiction in this matter due to its special expertise in regulatory matters.

Defendant's argument confuses two events: the present citizen's suit, to enforce an existing NPDES permit; and a renewal application asking for prospective permission to discharge a greater level of TSS than is currently allowed. While the latter determination may well be within the EPA's primary jurisdiction, particularly since it involves interpretation of substantive rules concerning effluent limitations in the organic chemicals industry, the determination as to whether defendant's own monitoring reports reveal permit violations is fully within the Court's competence and jurisdiction. Commentators have argued that the doctrine of primary jurisdiction should be invoked sparingly where it would serve to preempt a citizen's suit:

> The doctrine is ideally suited to the water pollution area, since discharge permit applications involve many technical questions which courts are generally not qualified to decide without the aid of an administrative decision. However, when the enforcement action is brought by a citizen, or by the Federal Government where the state has permit issuance authority, or vice versa, the doctrine of primary jurisdiction should be used with care. Otherwise, the state or Federal Government could, by delay in action or applications, frustrate the congressional intent to broaden enforcement authority.

Zener, The Federal Law of Water Pollution Control, in Federal Environmental Law (Dolgin & Guilbert, eds. 1974), 733. We see no justification for weakening the effectiveness of the section 505 citizen's suit by finding that the mere filing of a renewal application ousts the district court's jurisdiction for the time that the EPA spends considering the application.[12]

---

**12.** We do not share defendant's belief that *Montgomery Environmental Coalition Citizens Coordi-* *nating Committee v. Washington Suburban Sanitary Commission*, 607 F.2d 378 (D.C.Cir.1979)

Defendant's argument that a stay is warranted because the Court's action might be mooted by the retroactive effect of an approved renewal application is incorrect. The regulations to the Act establish that the conditions of an expired permit continue in force until the effective date of a new permit, 40 C.F.R. § 122.6(a) (1983), and such "continued" permits "remain fully effective and enforceable." 40 C.F.R. § 122.-6(b) (1983). Thus, even if defendant is ultimately permitted to discharge higher levels of TSS, there is no authority for the position that such a permit would be applied retroactively. *Cf. Menzel v. County Utilities Corp.,* 712 F.2d 91, 94 (4th Cir.1983) (no support in the Act for proposition that retroactive application of an NPDES permit will excuse a discharger from Act's mandate that compliance with permit program is a prerequisite to lawful discharge of pollutants).[13]

### 3. Plaintiffs' Motion for Partial Summary Judgment

■ Plaintiffs contend that they are entitled to partial summary judgment in that the permit violations recorded on defendant's own DMR's and NCR's establish liability. In its initial response to this motion, defendant argued primarily that partial summary judgment was inappropriate since the EPA's prosecution had been diligent (an argument relevant only to defendant's motion to dismiss) and that the permit violations were merely "technical" (an argument relevant only to the issue of damages). Over four months after plaintiff's motion was filed, however, defendant submitted a letter to the Court in which it raised a new argument in opposition to the motion: that "many of the results reported in the DMR's and in the NCR's which appear to show violations may actually be due

to inaccurate measurements or faulty test procedures." Def.'s Letter of December 7, 1983 at 2. Defendant asserts that, "[I]t is not at all clear that the information contained in the DMR's or NCR's constitute admissions by FDO as to the accuracy or truthfulness of the information reported therein. Rather, they constitute merely the required reporting of monitoring test results." *Id.* Defendant's speculations were unaccompanied by any direct evidence of reporting inaccuracies. One month later, defendant brought to the Court's attention two interrogatory responses and one EPA exhibit which purportedly support the earlier claims. *See* Def.'s letter of January 6, 1984 at 10–11. We are unconvinced, however, that partial summary judgment should not be granted.

We are in agreement with Judge Gerry's holding that "reports or records which are required to be kept by law, such as the DMR's and NCR's, may be used as admissions to establish a defendant's liability." *Student Public Interest Research Group, Inc. v. Monsanto Co.,* No. 83–2040 (D.N.J. 1983) (bench decision), Transcript of November 18, 1983 at 12–13. This result is consistent with the legislative history of the Act, which emphasizes the benefits of expedition in enforcing the Act:

[T]he bill ... establishes and makes precise new requirements imposed on persons and subject to enforcement. One purpose of these requirements is to avoid the necessity of lengthy fact finding, investigations at the time of enforcement. Enforcement of violations of requirements of this Act should be based on relatively narrow fact situations requiring a minimum, of discretionary decision-making or delay.

threatens this determination. In *Montgomery,* a case rife with procedural complications, plaintiff was essentially challenging concurrently an NPDES permit administratively and in federal court. Technical issues were presented concerning whether the terms of the permit violated applicable standards, and the court simply noted that resolution of those issues administratively might preclude the need for the federal action. In this case, the question of whether the

renewal permit being sought is justified, and the question of whether defendant is in violation of its present permit, are distinct, and can be dealt with in separate forums.

**13.** If defendant's argument were correct, there would have been no need for any EPA enforcement activity, or the Consent Order itself, pending the EPA's decision on the renewal permit, at least with respect to TSS violations.

S.Rep. No. 414, 92d Cong., 1st Sess. 64, *reprinted in* 1972 U.S.Code Cong. & Ad. News 3668, 3730.[14]

Defendant's last minute claims that it may have been erroneously overzealous in documenting its own transgressions will not deter our entering an order of summary judgment in favor of plaintiffs on the issue of liability.[15]

### APPENDIX

### UNITED STATES
### ENVIRONMENTAL PROTECTION AGENCY
### REGION II

```
– – – – – – – – – – – – – – – – – – – x
 :
In the Matter of :
 :
FRITZSCHE, DODGE AND OLCOTT, INC. : ORDER ON CONSENT
EAST HANOVER, NEW JERSEY 07936 :
 : CWA–II–82–75
NPDES Permit No. NJ 0001651 :
 :
Order pursuant to § 309(a) of the Clean Water Act, :
33 U.S.C. § 1319(a) and § 10(b) of the New Jersey :
Water Pollution Control Act, N.J.S.A. 58:10A–10(b) :
– – – – – – – – – – – – – – – – – – – x
```

### ORDER ON CONSENT

The following Order on Consent is issued pursuant to Section 309 of the Clean Water Act ("the Act"), 33 U.S.C. § 1319(a), under authority vested in the Administrator of the Environmental Protection Agency ("EPA") by the Act, and by him duly delegated to the Regional Administrator of Region II and pursuant to the New Jersey Water Pollution Control Act ("WPCA"), N.J.S.A. 58:10A–1 *et seq.*, under authority vested in the Commissioner of the New Jersey Department of Environmental Protection ("NJDEP") by N.J.S.A. 13:10–1 *et seq.*, and the WPCA and duly delegated to the Assistant Director of Enforcement of the Division of Water Resources pursuant to N.J.S.A. 13:1B–4.

WHEREAS, on June 6, 1979 the Director, Enforcement Division, pursuant to authority duly delegated, issued a National Pollutant Discharge Elimination System (NPDES) permit under Section 402 of the Act, 33 U.S.C. § 1342, to Fritzsche, Dodge and Olcott, Inc. (hereinafter, "the permittee") authorizing the discharge of pollutants from its facility located at Merry Lane, East Hanover Township into the Passaic River, which permit (No. NJ 0001651) became effective on July 31, 1979, and

WHEREAS, Condition A, Part I requires the permittee to comply with the following discharge limitations, among others:

14. We note that any issues concerning intent to commit permit violations are irrelevant under the Act. *See, e.g., United States v. Earth Sciences, Inc.,* 599 F.2d 368, 374 (10th Cir.1979). Furthermore, a discharger who fails to file accurate DMR's or NCR's would be subject to a citizen's suit for that alone. *See, e.g., Menzel,* 712 F.2d at 94.

15. As indicated at oral argument on December 19, 1983, further discovery and a hearing will take place on the issue of damages.

| OUTFALL SERIAL NO. | EFFLUENT CHARACTERISTIC | DISCHARGE LIMITATION AVG. DAILY | MAX. DAILY |
|---|---|---|---|
| 001–A | TSS (Total Suspended Solids) | 30 mg/1 | 60 mg/1 |
| combined 001–A and 001–B | TSS | 5.7 kg. | 11.3 kg. |

WHEREAS, an Order was issued by EPA Region II on September 30, 1982 finding that the permittee had exceeded TSS effluent permit limitations and requiring the permittee to submit a report on the causes of the violation and to appear and show cause why EPA should not refer the matter to the United States Department of Justice to institute a civil action for the imposition of penalties; and

WHEREAS, EPA on April 15, 1982 delegated the NPDES Program to the NJDEP, and

WHEREAS, the permittee did appear on April 20, 1983, before representatives of EPA, Region II and the New Jersey Department of Environmental Protection to explain its efforts to achieve compliance; and

WHEREAS, the permittee has formulated and implemented varius measures to bring its discharge into compliance with the effluent limitations of its NPDES permit; and

WHEREAS, the permittee has a timely filed NPDES permit renewal application pending and reserves the right to seek higher TSS limits when the draft-renewal permit is issued; and

WHEREAS, the permittee has informed both the EPA and NJDEP that at this time it intends to discharge its process wastewater to the East Hanover collection system by December 31, 1984 or as soon as the sewer lines are made available.

WHEREAS, the EPA, NJDEP and the permittee have agreed to resolve this matter through this Administrative Consent Order.

NOW, therefore, it is ordered as follows:

The permittee shall comply with the following schedule to achieve compliance with its effluent discharge limitations:

1. By August 20, 1983, complete and submit to the EPA and NJDEP, a report detailing all actions instituted by the permittee to attain compliance with the TSS permit limitations, and the alternative interim actions the permittee can reasonably implement in the period prior to ceasing its wastewater discharge, except for the discharge of its noncontact cooling water, to the Passaic River in order to achieve the TSS permit limitations or to minimize violations of same.

2. By December 31, 1984, complete the implementation of a long term control strategy and comply with permit effluent limitations for TSS.

Respondent shall submit progress reports quarterly to EPA and NJDEP, stating the progress made during the previous months in implementing Respondent's schedule of compliance, if any. Such progress reports shall be submitted to EPA and NJDEP not later than the 15th day of the month following completion of the quarter. The first quarter, for purposes of calculating reporting periods, shall be June, July and August 1983.

The permittee shall exercise its best efforts to implement an interim alternative, minimize incidents of noncompliance and achieve compliance with the TSS permit limitations as expeditiously as possible.

If a violation of this Consent Order occurs which causes Respondent's failure to achieve a final requirement of paragraph 2 above, or causes Respondent to reasonably expect that a final requirement of paragraph 2 will not be met on schedule, and such violation is caused solely by act of God, act of war, declaration of national emergency, or act of a third party beyond the control of and without the fault of Respondent; EPA will, at the request of Respondent, extend the date for compliance

by a period equal to the delay occasioned by the *force majeure.*

Any request for application of this paragraph shall be made to the Regional Counsel, EPA Region II, within ten (10) days of the occurrence of the alleged *force majeure* or act of a third party. If EPA denies Respondent the relief sought, Respondent may apply to the Regional Administrator, EPA Region II, for such relief within ten (10) days of the denial of relief. Respondent shall have the burden of proving that an application of *force majeure* should excuse defendant from any violation.

Nothing in this Consent Order shall constitute a waiver of any statutory right of the NJDEP pertaining to any of the laws of the State of New Jersey should the NJDEP determine that further remedial measures are necessary to protect the public health, safety, and/or welfare.

This administrative Consent Order shall take effect upon the signatures of all parties.

No party to this Order on Consent shall contend that the execution of the Order on Consent shall relieve the permittee from any of its past, present or future obligations under the Act or the New Jersey Water Pollution Control Act.

Dated Nov. 25, 1983
· /s/ Jacqueline E. Schafer
JACQUELINE E. SCHAFER
Regional Administrator
U.S. Environmental Protection
Agency, Region II

Dated Sept. 29, 1983
ROBERT E. HUGHEY
Commissioner
New Jersey Department of
Environmental Protection
By: /s/ George G. McCann
GEORGE McCANN
Assistant Director
Enforcement Element
Division of Water Resources

*Consent By Permittee*

Permittee acknowledges ·the authority and jurisdiction of the Regional Adminis-trator, Region II, EPA and the NJDEP Director of Water Resources to issue the foregoing ORDER ON CONSENT, accepts the terms and conditions of said ORDER ON CONSENT and the issuance thereof,

Fritzsche, Dodge & Olcott, Inc.
By: /s/ Hans J.H. Reinack
TITLE: Hans J.H. Reinack,
President