**STUDENT PUBLIC INTEREST RE-SEARCH GROUP OF NEW JERSEY, INC., et al., Plaintiffs,**

v.

**P.D. OIL & CHEMICAL STORAGE, INC., Defendant.**

**Civ. A. No. 84–340.**

United States District Court, D. New Jersey.

Jan. 13, 1986.

Michael Gorden, Gordon & Gordon, West Orange, N.J., Bruck J. Terris, and Nathalie V. Black, Terris & Sunderland, Washington, D.C., for plaintiffs.

Nathan M. Edelstein, Edelstein & Bernstein, Lawrenceville, N.J., for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This case was brought by two environmental conservation organizations, Student Public Interest Research Group of New Jersey [hereinafter "SPIRG"] and Friends of the Earth [hereinafter "FOE"], against P.D. Oil and Chemical Storage, Inc. [hereinafter "P.D. Oil"] as a citizen suit under the Federal Water Pollution Control Act [hereinafter "FWPCA"], 33 U.S.C. § 1251 *et seq.* (1982).

Plaintiff's allege that defendant has violated and continues to violate Sections 301 and 402 of the FWPCA by failing to comply with the effluent limitations in its National Pollutant Discharge Elimination System/New Jersey Pollutant Discharge Elimination Systems permit [hereinafter "Discharge Permit"].

Plaintiffs have moved for partial summary judgment that defendant is liable for these violations. Defendants have moved to dismiss plaintiffs' complaint on various grounds and oppose the motion for partial summary judgment.

As an understanding of the factual setting of this dispute and the history of the FWPCA is important to the resolution of all of the issues raised by the parties, I turn first to these preliminary matters.

## FACTS

Congress enacted the Federal Water Pollution Control Act in 1972. The 1972 statute represented a distinct change in federal water pollution control policy. Prior to 1972, the focus of federal water pollution law was on the quality of the receiving waters, which was to be protected through water quality standards. Water Quality Act of 1965, Pub.L. 89–234, 79 Stat. 903.

This system of pollution control led to substantial problems in enforcement because of the difficulty in establishing precise effluent limitations for particular pollutants on the basis of the water quality desired for the receiving bodies of water. *See* Federal Water Pollution Control Act Amendments of 1971, S.Rep. No. 414, 92d Congress, 1st Sess., 8, 12 (1971); reprinted in 1972 U.S.Code Cong. & Ad.News 3668, 3675 and 3679. The effort to control water pollution using only this method was found to be "inadequate in every vital aspect." S.Rep. No. 414, *supra,* 2 Legis.Hist. at 1425, 1972 U.S.Code Cong. & Ad.News at 3674.

The 1972 legislation contained "a major change in the enforcement mechanism of the federal water pollution control program from water quality standards to effluent limits." S.Rep. No. 414, *supra,* 1972 U.S. Code Cong. & Ad.News at 3675. Water quality standards for the receiving waters were retained as a measure of pollution control effectiveness, but "the basis of pollution prevention and elimination will be the application of effluent limitations" to particular polluters for particular pollutants. S.Rep. No. 414, *supra,* 1972 U.S. Code Cong. & Ad.News at 3675.

The goal of the FWPCA, as stated in 33 U.S.C. § 1251(a)(1) was to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters ..." and it was the stated national goal "that the discharge of pollutants into the navigable waters be eliminated by 1985."

This objective is implemented through Section 301(a) of the F.W.P.C.A., 33 U.S.C. 1311(a), which states:

Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful.

Thus, the FWPCA sets forth a *total prohibition* of the discharge of pollutants, except pursuant to specific authorization.

The FWPCA provides in Title IV, 33 U.S.C. 1341–1345, for the issuance of dis-

charge permits. These permits are designed to allow progressively decreasing levels of pollutant discharges in order to improve the nation's waters. Compliance with a permit issued pursuant to one of these permit programs established by the FWPCA is deemed compliance with Section 301 and allows discharges which would otherwise be unlawful. *See* 33 U.S.C. 1342(k) and 1344(p).

Plaintiffs allege that, conversely, noncompliance with a permit constitutes noncompliance with Section 301 and represents a violation of the FWPCA. Defendants allege that noncompliance with a permit is not a violation of the FWPCA where such noncompliance is as a result of an "upset." An "upset" is defined as "an exceptional incident in which there is unintentional and temporary noncompliance with technology-based permit effluent limitations because of factors beyond the reasonal control of the permit fee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation.": *See* N.J. A.C. 7:14:A–1.9 (1984 Supp.).

For reasons which I will describe *infra*, defendant's allege that they were operating in an "upset" condition. The permit program applicable in this case is established in Section 402—the National Pollutant Discharge Elimination Systems (NPDES). Section 402(a)(1), 33 U.S.C. 1342(a)(1), authorizes the Administrator of the United States environmental Protection Agency (hereinafter "the Administrator" or "EPA") or a state, if its permit program has been approved by the Administrator, to issue permits authorizing the discharge of pollutants "upon condition that such discharges will meet . . . all applicable requirements under Sections 301, 302, 306, 307, 308, and 403." Thus, the NPDES is "a permit system whose function is to define the discharger's obligations under the Act by [setting] limitations designed for the discharger's particular operation." *Student Public Interest Research Group of New Jersey, Inc. v. Fritzsche, Dodge &*

*Olcott, Inc.*, 579 F.Supp. 1528, 1531 (D.N.J. 1984).

NPDES permits issued under Section 402(a)(1) must comply with Section 308(a)(4)(A). The latter section requires the Administrator to require permittees to establish and maintain records, to install, use and maintain monitoring equipment, to sample effluents and to report to EPA in the manner prescribed by the Administrator. In implementing this section, the Administrator has prescribed regulations which require, as a condition to all permits, the reporting of all monitoring results in a Discharge Monitoring Report (DMR) at intervals which are to be specified in the permit. 40 C.F.R. 122.41(1)(4). The DMR is a uniform, national form devised by EPA for the self-reporting of monitoring results. 40 C.F.R. 122.2.

Discharge permit number NJ 000.3361 was issued to defendant's predecessor in interest, El Dorado Terminals Corp., on May 30, 1974. The permit authorized El Dorado to discharge limited quantities of pollutants into the water from its facility through a single discharge point. The permit was modified in 1978 and a new permit was issued in 1981, which is in effect until April, 1986. Each permit specified effluent limitations for various pollutants.

The present permit holder, P.D. Oil, is located in Bayonne, New Jersey on the far eastern end of the Kill Van Kull [the "Kill"], which is one of the most highly industrialized waterways in the United States. The Kill is part of the greater Port of New Jersey and New York Channel complex and it links Newark Bay (to the east) with the Arthur Kill Channel to the west. The entire Bayonne shoreline of the Kill is industrialized with the single tail-end exception of the Kill Van Kull Park situated approximately (2) miles to the west of P.D. Oil. (*See* defendant's exhibit entitled "Land Uses Along the Kill Van Kull.").

P.D. Oil acquired the El Dorado site in Bayonne, New Jersey in July 1977. Defendants contend and plaintiff's do not dispute that the property was in desperate

need of cleaning up and that P.D. undertook to do so.

P.D. is situated on approximately 30 acres and owns and operates nearly 170 tanks ranging in size from 20,000 to 1.1 million gallons capacity. P.D. receives bulk liquid commodities owned by others and holds them in the storage tanks for loading, upon instruction from the commodity owners, to rail cars, tank trucks or ocean going tankers (via the Kill Van Kull.).

P.D.'s discharges which are at the heart of this lawsuit are as a result of spillage, tank overflow and steam condensation which collects in P.D.'s collection system along with rain water and is discharged through a four inch out fall pipe leading into the Kill. The amount of discharge varies, depending on the amount of rainfall.

P.D. has monitored this discharge regularly since June 1, 1977 via the DMR's required under their discharge permit. Plaintiff's contend that defendant's own reports demonstrate that they have violated the permitted effluent limitations a total of 154 times. Plaintiffs submit that under FWPCA, these violations of permit limitations are automatically violations of the Act. As defendants have, by their own admission, violated the terms of their permit, plaintiffs contend that summary judgment is proper and should be granted on the issue of liability.

In addition to the procedural and jurisdictional issues raised by defendant, they oppose the plaintiffs' motion for summary judgment on the grounds that there are genuine material issues of fact in dispute. Defendants allege that they have operated within the permissible limits of their permit because:

1. They were operating under a declaration of an "upset,"

2. Plaintiffs have misstated the requirements and applicable effluent limitations under the discharge permit, and

3. The plaintiffs misinterpret and erroneously rely on the DMRs because the DMRs misstate the permit requirements.

Because defendants have raised a number of threshhold issues which must be resolved before the merits of this case may even be considered. I consider first the issues raised by defendants.

Defendant has moved for the following relief:

1. To dismiss the complaint for lack of subject matter jurisdiction and/or for prudential reasons due to plaintiffs' lack of standing; or

2. For summary judgment for such relief;

3. To dismiss all counts for relief relating to discharges allegedly occurring before January 27, 1981, as barred by the statute of limitations;

4. To dismiss the complaint because plaintiffs are estopped from prosecuting same or because of laches; and/or because plaintiffs have waived their rights, if any, to do so; and/or because due process require dismissal;

5. For a site visit by the Court prior to determination of plaintiffs' motion for summary judgment and/or defendant's motions;

6. For abstention and remand to the New Jersey Department of Environmental Protection;

7. For relief and attorneys' fees under Rule 11 of the Federal Rules of Civil Procedure; and

8. For an evidentiary hearing on the standing question prior to determination of plaintiffs' summary judgment motion.

## JURISDICTION

This court has jurisdiction pursuant to 33 U.S.C. 1365(a). Venue is appropriate in the District of New Jersey pursuant to 33 U.S.C. § 1365(c)(1) because the source of the alleged violations complained of is located within this District.

## STANDING

██ This action is brought under the citizen suit provision of the FWPCA, 33 U.S.C. § 1365(a)(1). The standing conferred under this provision must be read in conjunction with the constitutional requirements for standing, which were clearly summarized in *Valley Forge Christian College v. Americans United,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The Court stated:

> [a]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' ... and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision....' *Id.* at 472, 102 S.Ct. at 758, *citations omitted.*

Under this test the standing of the plaintiffs must be examined in three respects:

1. There must be direct injury to these plaintiffs;

2. Their injury must fairly be traced to P.D.'s activities; and,

3. Plaintiff's injury must be redressable by a ruling holding P.D. liable.

Defendants have raised the standing issue as part of their motion to dismiss. Under rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may move to dismiss for lack of jurisdiction over the subject matter based on the pleadings. However, where matters outside the pleadings are presented to the court, such as the depositions and affidavits submitted here, the motion is to be treated as one for summary judgment and disposed of as provided for in Rule 56. *See* F.R.Civ.Pro. 12(c).

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is not to be granted. unless, after all reasonable inferences are drawn in favor of the non-moving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of

law. *See Sames v. Gable,* 732 F.2d 49, 52 (3d Cir.1984).

Defendant's motion to dismiss plaintiff's complaint may, therefore, not be granted unless all reasonable inferences are drawn in favor of plaintiffs, and plaintiffs' motion for summary judgment may not be granted unless all reasonable inferences are drawn in favor of defendant.

Defendant contends that there is no direct and palpable injury to either organizational plaintiff or to any individual member of the organization. Secondly, defendant contends that, even if plaintiffs can show direct injury, their concerns are generalized panoramic environmental interests and that their grievances are not related in any cognizable way to defendant's conduct. As part of this argument, defendant contends that what .they are putting into the Kill Van Kull are not pollutants even though some of the numbers in the discharge permit are in excess. Lastly, defendant contends that because of the uniquely industrial-commercial use of the Kill Van Kull now, and as planned for by governmental agencies, and the sewage outfalls and storm water runoffs and shipping in the Kill, the court cannot provide relief in this case to cure plaintiffs generalized complaints.

Addressing the first prong of *Valley Forge's* three-part test, defendant quotes extensively from depositions and affidavits of individuals the organizational plaintiffs rely on for standing in an effort to show that no injury in fact has been alleged. I find that, on the contrary, these depositions and affidavits illustrate in great detail the individual interests which are directly affected by defendants alleged acts.

██ A member of NJPIRG, Cheryl Cummings, stated in her affidavit that her family home is one block north of the Kill Van Kull. She and her family have used the park along the Kill Van Kull for the past 19 years. She uses the park for biking and jogging. She stated that "the water in the Kill Van Kull looks and smells terrible. The pollution in the Kill Van Kull has diminished my enjoyment of the park. The park is often not a pleasant place to be."

In her deposition, Ms. Cummings testified that her enjoyment of the park was affected "by the general unpleasantness of the Kill Van Kull," and that the water has "a film" which is "sometimes like a rainbow or sometimes like greenish-yellow" and that she would enjoy the park more if the water were cleaner. Her recreational and aesthetic interests clearly are directly affected by the condition of the water in the Kill Van Kull which plaintiff alleges is at least partially attributable to defendant's acts.

Sheldon Abrams, a member of Friends of the Earth, stated in his affidavit that he drives by the Kill Van Kull regularly and has "noticed that the shores are black and there is an oily sheen on the water." He also boats in the Lower New York Bay into which the Kill Van Kull flows. He could boat and fish in the Kill Van Kull if it were cleaner, and would enjoy his recreational activities in Lower New York Bay more if the water flowing into it from the Kill Van Kull were cleaner. Mr. Abrams clearly has a direct recreational and aesthetic interest in the Kill. In addition, Mr. Abrams eats the fish he catches in New York Bay, he has a health interest in the water there.

Another member of Friends of the Earth, Andrew Gerbino, stated in his affidavit that he "would hike and birdwatch on [the Kill Van Kull] if it were cleaner." He also stated his belief that the value of his home on Staten Island is decreased by the pollution in the Kill Van Kull and Lower New York Bay, which "makes Staten Island a less pleasant place to live." Mr. Gerbino noted in his deposition that he used to walk on the Staten Island side of the Kill, but no longer does so, in part "because it's not attractive." He further stated that the chemicals in the water create an air pollution or odor problem, which he has noticed "just opening my front door" and particularly "riding on the ferry, I could smell it getting into St. George, wind blowing from the west you can smell all those things, even on a Sunday when firings aren't operating." He also noted that he "can't eat any crabs or clams" caught in the area, although "all these waters used to be used for lobster catching and clamming, crab catching. You don't see anybody doing that anymore." There is no question that Mr. Gerbino is adversely affected by the pollution to which plaintiff alleges defendant has contributed.

Numerous other members of the plaintiff organizations testified to various recreational and aesthetic interests that are adversely affected by the pollution in the Kill. These individuals do not pursue their interest in birdwatching, tennis, jogging, bicycling or fishing to the extent they would like to, if at all, due to the pollution. Defendants have not disputed that these individuals do indeed have these interests. Under *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), injury for standing purposes need not be economic; it can be injury to aesthetic, recreational or environmental values. *See also Middlesex County v. National Sea Clammers*, 453 U.S. 1, 16–17, 101 S.Ct. 2615, 2624–2625, 69 L.Ed.2d 435 (1981). Plaintiffs have met the first prong of the *Valley Forge* test.

■ Defendants address the second prong of this test by contending that plaintiff's interests are not related in any cognizable way to defendants conduct and that defendant does not pollute the Kill.

The first part of defendant's argument has already been addressed by at least two of my colleagues in great depth, and I find their rulings persuasive on this issue. Plaintiffs are not required to show that a certain percentage of the pollution that affects their interests is traceable to defendant's effluent. As Judge Stern explained in *Student Public Research Group v. AT & T Bell Laboratories*, 617 F.Supp. 1190, 1202 (D.C.N.J.1985), Congress did not intend to require plaintiffs "under the FWPCA to isolate and define the injury from a particular polluter in order to show a violation," as such a requirement "would defeat the purpose of the FWPCA and other pollution-control laws. In general, numerous polluters contribute to an environmental harm like pollution of rivers. It is not possible to divide up the general harm

and allocate shares to particular polluters. This was why Congress enacted the 1972 amendments to the FWPCA that abandoned permit limits based on the impact of discharges on water quality and adopted permit limits based on technological controls on polluting facilities."

Defendant's argument that they are not the ones causing plaintiff's interest to be harmed because of all the other pollution that is put into the Kill has been made many times before, and when taken to its logical conclusion, allows plaintiffs to sue no polluters unless they can sue all in one action. This is not the intent of the FWPCA.

■ In addition, I note Judge Brotman's equally appropriate reaction to this specific causation theory. He noted in *Student Public Interest Research Group v. Georgia-Pacific Corp.*, 615 F.Supp. 1419 (1985) that:

> Defendant asks the court to find that the company's effluents do not cause actual harm even though the court may later determine that such effluents violate defendant's permit, and so, the Clean Water Act, *Consequently, defendant would have the Court apply a stricter test for standing than for liability itself. See id.*, at 1424.

Defendant argues that it does not pollute even though it has reported violations of its permit under the Clean Water Act. Defendant alleges that what it discharges into the Kill are not pollutants. This, however, is not the issue before me. Congress has already made a determination of what effluents it considers violative of the Clean Water Act—these effluents are limited in accordance with defendant's discharge permit. Under the statutory scheme set up by Congress, it is not the court's role to determine whether defendant is polluting the Kill Van Kull, rather the court's role to determine whether the FWCPA, specifically 33 U.S.C. § 1342(k) and § 1344(p), has been violated.

■ Plaintiffs show causation merely by showing violations of the discharge permits, thus, further discussion of this issue

will await my discussion of the merits of this case. Plaintiffs meet the second part of the *Valley Forge* test if they show these violations.

Lastly, defendants contend that plaintiffs' injury cannot fairly be redressed by a favorable decision. *See Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758. Once again, defendants ignore the reasons for the enactment of 1972 amendments to the FWPCA.

■ Judge Stern also addressed this argument in detail in *SPIRG v. AT & T, supra.* He held that plaintiff's in a suit such as this one are the beneficiaries of a legislative grant of standing in § 505 of the FWPCA, 33 U.S.C. § 1365 (1982). They have met the minimal Article III showing of "a distinct and palpable injury" to themselves, and if their suit is successful, "the general public interest will benefit." *SPIRG v. AT & T* at 1200. In addition, plaintiff's suit will deter other polluters of the same waterways. Congress intended both general and specific deterrence to be a purpose of the sanctions under the FWPCA. *See* Judge Stern's opinion, *supra* at 1201 quoting, *U.S. Environmental Protection Agency, Policy on Civil Penalties, E.P.A. General Enforcement Policy GM-21*, (Feb. 16, 1984). Plaintiffs have standing to redress their injuries by seeking relief in the form of general deterrence. As there are no disputed issues of material fact relevant to the determination of plaintiffs' standing, defendant's request for an evidentiary hearing is denied.

### STATUTE OF LIMITATIONS

■ Defendant next contends that plaintiffs' claims are time barred under 28 U.S.C. § 2415(b). Defendant argues that a three year statute of limitations applies to plaintiffs' claims.

A three year statute of limitations would significantly alter the posture of this case. For example, defendant has had no N.J.P. D.E.S. effluent standard for cadmium or styrene since 1981, and all effluent limitations for petroleum hydrocarbons and chlo-

rinated hydrocarbons were eliminated in 1981. Plaintiffs seek to impose liability for alleged violations in the 1970s of standards pertaining to cadmium, styrene, petroleum hydrocarbons and chlorinated hydrocarbons. In 1978, defendant reported that there was no styrene at the facility, and the EPA accepted that report. Defendant contends that it is prejudiced by having to defend its records on this issue where the EPA required no further records, and, thus, none were maintained. I find this reasoning unpersuasive in convincing me to apply any statute of limitations to this suit. No other federal statute of limitations applies to actions brought by EPA to enforce NPDES/NJPDES permits under the Act. Defendant cites *DelCostello v. Teamsiers,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) in support of its general proposition that the Court should adopt a federal statute of limitations. *DelCostello* concerned an employees action against his union for breach of its duty of fair representation.

In *DelCostello,* the question before the Court was whether, in the absence of a statute of limitations in the federal statute granting the right of action, a state statute should be borrowed. The Court rejected a state limitation period, finding that in light of the federal policies of the statute, an analogous federal limitation period should be applied. 103 S.Ct. at 2289. The test applied was whether the state rule would further federal purposes or be "at odds with the prupose or operation of federal substantive law." *Id., note* 12. However, the Court expressly noted that the substantive federal policies may require that no limitations period at all apply, state or federal. *Id.* at 2293, n. 20.

Here, I find that it would contravene the substantive federal policy of the FWCPA to impose a statute of limitations as defendant requests. Here, plaintiffs' act as EPA's surrogate enforcers. Plaintiffs suing under § 505 are suing as private attorneys general on behalf of EPA and the states. *See Middlesex County Sewerage Authority, supra,* 453 U.S. at 16–17, 101 S.Ct. at 2624–2625. The application of a federal limitations period to NPDES en-

forcement actions would seriously distort the enforcement scheme Congress has established. That enforcement scheme places primary enforcement responsibility in the hands of the states. 33 U.S.C. § 1251(b), 1319. If the states fail to enforce NPDES permits, however, either EPA or citizens may assume the states' responsibility. S.Rep. No. 414, 92 Cong., 1st Sess. (1971), p. 64, 1972 (Code Cong. & Ad.News 3747.) Citizens can equally sue if the EPA fails to carry out enforcement responsibilities. *Id.*

If the EPA brought this suit no state statute of limitations should be borrowed. *See SPIRG v. AT & T, supra* at 1202, *citing United States v. Summerlin,* 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940) and *United States v. Podell,* 572 F.2d 31, 35 (2d Cir.1978).

If a federal limitations period is deemed applicable to actions brought by citizens, it would significantly reduce the effectiveness of citizen enforcement when the states or the EPA fail to carry out their responsibilities. Congress intended the citizens to be able to substitute for the EPA and the states if these governmental agencies failed to enforce NPDES permits. *See* Senate Report No. 414, *supra* p. 65.

As Judge Stern noted:

We have seen already that Congress sought to promote *regulatory uniformity* by providing identical enforcement mechanisms for citizen and governmental suits under the FWPCA. The major purpose of the policy favoring uniformity is to prevent states from trying to outbid their neighbors for industries and jobs by maintaining lower pollution standards. *SPRIG v. AT & T, supra* at 1202.

In addition to the lack of any federal substantive policy in favor of the statute of limitations defendant seeks, defendant is not prejudiced by the lack of a statute of limitations. Although defendant claims that unless there is a three-year limitation period imposed, it will be unable to challenge the assertions that it has violated its permit, it quotes from a 1978 report it sent

to the EPA. Obviously, defendant has the material at hand which relates to plaintiffs' claims. Defendant also has recourse to EPA and state agency files for any recourse to EPA and state agency files for any records it has not retained. I hold, therefore, that no statute of limitations is applicable to the instant action.

### ABSTENTION

■ Defendant contends that this case should be dismissed under the abstention doctrine because it unduly interferes with state administrative efforts to require defendant's compliance with its permit. This argument need not detain us long. As should already be clear from my previous discussion, Congress intended citizen suits to supplement state governmental action. One does not preclude the other under the scheme set up under the FWPCA. I will, therefore, not abstain from ruling in this case due to state administrative efforts in the same area.

### LACHES

Defendant also contends that plaintiffs are estopped or that laches apply. I do not agree.

■ The law is established that the defense of laches may not be asserted against the government. The Supreme Court has consistently held that laches is no defense to a suit to enforce a public right or protect a public interest. *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1970); *United States v. California*, 332 U.S. 19, 39–40, 67 S.Ct. 1658, 1668–1669, 91 L.Ed. 1889 (1947); *Utah Power and Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917). The rule is founded on two basic concerns: 1) the magnitude and importance of the rights at stake when the interests of the public are asserted; and 2) the determination that those rights cannot be compromised or forfeited by the negligent or illegal acts of those who act not for themselves but only as guardians of the public, *United States v. California, supra*, 332 U.S. at 39–40, 67 S.Ct. at 1668–1669.

■ These same policies are at stake in actions to enforce discharge permits under the FWPCA. Congress' objective in enacting this legislation was "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Senate Committee report stated that it included a provision in the policy declaration of the act (33 U.S.C. § 1251(e) ) encouraging public participation in the enforcement process "because the Committee recognizes that the manner in which the measures are implemented will depend, to a great extent, upon the pressures and persistence which an interested public can exert upon the governmental process." S.Rep. No. 414, *supra*, p. 12.

As citizen plaintiffs stand in the shoes of the government "as private attorneys general," it makes no sense to apply laches in a citizen suit. Citizen plaintiffs should not have fewer rights to enforce the statute than government agencies. Plaintiffs are, therefore, not estopped or barred by laches.

### RULE 11

Defendant has also moved for sanctions under Rule 11 of the Federal Rules of Civil Procedure, alleging that plaintiff has instituted this litigation in bad faith. I find this motion frivolous and will not waste the court's time addressing it. My holding on this motion demonstrates that I do not find that plaintiffs attempts to settle this case in exchange for donations and attorney fees were in bad faith.

### "UPSET" CONDITIONS

Defendant contends that summary judgment in favor of plaintiffs should be denied for a number of reasons, the first of which is that defendant operated "in compliance" and under a declaration of "upset."

The EPA regulations allow permittees to raise certain affirmative defenses to allegations of permit violations such as an upset. An "upset" is an exceptional incident in which there is unintentional and temporary

noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee. 40 C.F.R. § 122.41(h) (1984). In its preamble to this regulation, EPA stated (44 Fed.Reg. 32854, 32863 (June 7, 1979)):

> Violations of stricter state standards or *water quality based effluent limitations* are not subject to a defense of upset. (emphasis added)

EPA recently reaffirmed this limitation on the upset defense, stating that it is "not available to permittees for violations of water quality based permit conditions." 49 Fed.Reg. 38039 (September 26, 1984).

EPA's regulations specifically provide that all state programs must be administered in conformance with EPA's requirements for an upset defense. 40 C.F.R. 123.25(a)(12). Consequently, NJDEP's regulations similarly provide (N.J.A.C. 7:14A-3.10(c)):

1. Effect of an upset. An upset may constitute an affirmative defense to an action brought for noncompliance with such technology-based permit effluent limitations if the requirements of paragraphs (c)2. of this section are met. Where no determination was made during administrative review of claims that noncompliance was caused by upset, and there has been no Departmental action for noncompliance, the lack of such determination is final administrative action subject to judicial review.

2. Conditions necessary for a demonstration of upset. A permittee who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:

 i. An upset occurred and that the permittee can identify the specific cause(s) of the upset;

 ii. The permittee facility was at the time being properly operated; and

 iii. The permittee submitted notice of the upset as required in paragraph (a) of this section.

iv. The permittee complied with any remedial measures required under 2.5(d).

3. Burden of proof. In any enforcement proceeding the permittee seeking to establish the occurrence of an upset has the burden of proof.

N.J.A.C. 7:14–3.10(c).

■ Defendant's permit provides that the effluent limitations for biological oxygen demand and total suspended solids are based on state water quality standards. Violations of these limitations therefore are not subject to the upset defense. Fifty-four of defendant's 164 permit violations fall in this category.

■ Defendant's upset defense is also inapplicable to permit violations prior to August 13, 1979.

EPA's upset regulation became effective on August 13, 1979. 44 Fed.Reg. 32854 (final rule). Prior to that time, EPA's regulations did not provide for an affirmative defense to enforcement actions. 43 Fed. Reg. 37078 (Aug. 21, 1979) (proposed rule). EPA's pre–1979 policy on the upset provision is contained in a March 16, 1977, decision of its general counsel. NPDES Decision of the General Counsel. In that opinion, EPA concluded that, "[i]f effluent limitations guidelines are applicable, but do not address the availability of upset and maintenance conditions, or if no effluent limitations guidelines have been promulgated," the Regional Administrator may consider inserting an upset provision in a specific NPDES permit. *Id.* at 331.

Defendant has presented no evidence that, prior to August 13, 1979, its permit was based on effluent limitations guidelines containing an upset provision. Defendant's permit did not contain an upset provision until March 2, 1981. Consequently, defendant had no right to an upset defense for the 21 violations occurring prior to that date.

■ The burden is on defendant to demonstrate that each of its violations satisfy all of the requirements of the upset regulation. 40 C.F.R. 122.41(n)(4); N.J.

A.C. 7:14A–3.10(c)(3). Those requirements are specific and detailed (40 C.F.R. 122.-41(n)(3) );

> A permittee who wishes to establish the affirmative defense of upset shall demonstrate, through properly signed, contemporaneous operating logs, or other relevant evidence that:
>
> (i) An upset occurred and that the permittee can identify the causes(s) of the upset;
>
> (ii) The permitted facility was at the time being properly operated;
>
> (iii) The permittee submitted notice of the upset as required in paragraph (1)(6)(ii)(B) of this section (24 hour notice); and
>
> (iv) The permittee complied with any remedial measures required under paragraph (d) of this section [40 C.F.R. 122.-41(d) ].

In addition, the definition of upset in 40 C.F.R. 122.41(n)(1) requires that an upset be an "exceptional" incident, that it be "unintentional and temporary," that it be "beyond the reasonable control of the permittee," and that it not be caused by "operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operators." NJDEP's upset regulation contains similar requirements, including the requirement of a minimum of 24-hour notice. N.J.A.C. 7:14A:3.10(c)(2) and 3.10(a)(v).

█ Defendant has provided no evidence that satisfies any of these requirements for any particular permit violation alleged by plaintiffs. Instead, defendant broadly asserts that all of its permit violations qualify as upsets. EPA's regulations do not permit this type of blanket defense. They require that defendant demonstrate through relevant evidence that each upset is "an exceptional incident" and meets all the other requirements of the regulation. For example, EPA's regulations require that the defendant show that it provided EPA and NJDEP with 24-hour notice. Defendant's upset defense is defective as a matter of law as to all of its violations on this ground alone.

█ Defendant has presented EPA compliance inspection reports in which an EPA employee stated that some permit violations were due to an "upset" condition at defendant's facility. I find that defendant attempts to use these reports and the "upset" issue as a smokescreen to obfuscate the true facts of this case. These reports do not establish an EPA finding that there was an upset. A compliance inspection report is not a formal agency determination. The comments of the EPA employee in the inspection report constitute, at most, a determination by that employee that the EPA should exercise its discretion not to prosecute the relevant permit violations. There is no basis for giving that opinion any weight in this proceeding where defendant has made no independent effort to submit any evidence that it meets each requirement of the upset regulation. Defendant's upset defense is invalid, therefore, for this reason also.

Because I find that there has not been an EPA administrative determination of an upset, there is no need to reach the issue of whether plaintiffs have waived their right to challenge EPA's designations of upsets.

Secondly, defendants contend that summary judgment may not be granted because plaintiffs misstate the requirements and applicable effluent limitations which defendants NJPDES permit regarding, among other things, biological oxygen demand (B.O.D.), total suspended solids (T.S.S.), and oil and grease. Lastly, defendants contend that plaintiffs misinterpret and rely erroneously on the DMRs because the DMRs themselves dramatically misstate the permit requirements and thus present a confused and misleading portrait of defendants discharge and the applicable effluent limitations.

Defendant's arguments are more properly with Congress than with the Court.

█ Under the law and under EPA's interpretation, violations of permit limitations are violations of the law. EPA's posi-

tion is stated in its Enforcement Management System guide (Technical Review Criteria) (1977):

> Screening based upon the Technical Review Criteria *does not* establish which deviations from the effluent limitations are violations of the permit or of the Federal Water Pollution Control Act—all such deviations, unless specifically authorized elsewhere in the permit, *are violations.* (emphasis in original)

■ Second, defendant relies on inspection reports which, in some instances, stated that defendant was found to be "in compliance." Defendant, however, chooses to ignore the series of letters sent to it by EPA and New Jersey DEP informing it of its persistent violations and the agencies' concern. For example, in letters dated November 7, 1980 and September 1, 1981, defendant was informed that its discharge appeared not to comply with its effluent limitations, and was requested to provide information regarding:

> The steps taken or planned to reduce and eliminate the noncompliance; The steps taken, or planned, or being taken to prevent recurrence of the condition and to ensure future compliance with permit limitations.

On November 2, 1981, the Chief of the Water Enforcement Branch for EPA, Region 2, wrote to defendant regarding its recent DMRs, which showed that it had exceeded its permit limitations. The letter states:

> A review of past DMRs reveals a serious and persistent pattern of violations. It is necessary that the corrective measures you are taking be sufficient to ensure future compliance. Consistent excursions of your permit limitations can result in enforcement action under the provisions of the Clean Water Act.

On December 9, 1981, New Jersey DEP wrote to defendant, pointing out that its "effluent exceed[ed] the Permit limits for BOD5, COD, pH, and Oil and Grease." On February 10, 1982, EPA again wrote to defendant, noting that while the reported values for BOD and COD has improved, they were "concerned about the continuous nature of these violations."

On June 18, 1982, EPA responded to defendant's explanation of its exceedances, again stating that they were "concerned about your continuous violations and would like to be assured that progress is being made, as was implied by your letter."

Finally, in April 1984, an inspection of the defendant's facility resulted in a report giving defendant's status as "serious deficiencies/violations (enforcement action recommended)," noting that "permittee still in violation of effl[uent] limit[ations]," that "construction has not eliminated viol[ations] as planned," that "treatment needs expansion," that "reviewing DMRs and permittee's records show violations still exist," and that "discharge effluent violation still exist, no change since issuance of permit." In short, defendant had been and continued to be in violation of its permit.

■ As to inaccuracies and inconsistencies defendant contends are present in the DMR forms, I find that the permit is not incorrect or inconsistent. It reflects the regulatory structure established by the Act. The Act envisions both general technology-based effluent limitations (33 U.S.C. 1311(b)(1)(A)) and specific limitations adopted to achieve identified water quality standards (33 U.S.C. 1311(b)(1)(C)). The "technology-based treatment requirements under section 301(b) of the Act represent the minimum level of control that must be imposed in a [NPDES] permit." 40 C.F.R. 1245.3. Where water quality standards have been adopted, the permit may impose stricter effluent limitations in order to achieve those standards. 33 U.S.C. 1311(b)(1)(C); 40 C.F.R. 122.44(d). The stricter limitations are controlling. *Id.*

■ Here, the State of New Jersey has adopted water quality standards for the waters of the State, including the Kill Van Kull. These are reflected in Part B of the defendant's permit, which is entitled "State Requirements." The Kill Van Kull is classified as TW3 waters. *Id.* For such wa-

ters, the water quality standards include, for oil and grease and TSS, a "none noticeable" standard. *Id.* This is not a permit limitation. It is a water quality standard.

Water quality standards are to be achieved through permit limitations. Here, the oil and grease limitation (15 mg/1) is stated in Part A of the defendant's permit, the part imposed by EPA. *Id.* at 219a. Since no state limitation is imposed in Part B, the limitation set forth in Part A controls.

As to TSS, the technology-based standard in Part A is 60 mg/1. However, more stringent limitation for TSS has been adopted by the State of New Jersey through the Interstate Sanitary Commission operating under the Tri-State Compact (N.J.S.A. 32:18–1, *et seq.*). Those stricter limitations are an average discharge concentration of 30 mg/1, and a maximum concentration of 45 mg/1. *Id.* at 221a. These limitations are stated in Part B. Because the water quality-based limitations in Part B are more stringent than the otherwise applicable technology-based TSS limitation in Part A, the limitations in Part B control as a matter of law. See 40 C.F.R. 122.44(d).

Similarly, the State of New Jersey has adopted, through the Interstate Sanitary Commission, water quality-based limitations for BOD in Part B of the permit. Those limitations are an average discharge concentration of 30 mg/1, and a maximum concentration of 45 mg/1. *Id.* In these circumstances, defendant's argument that EPA omitted BOD from Part A of its permit is irrelevant. Whether or not a limitation for BOD is included in Part A of the permit, the limitations in Part B, being more stringent, control. *See* 40 C.F.R. 122.44(d).

The pre-printed DMR forms, rather than being inconsistent with the permit, instead demonstrate that EPA agrees with the analysis of the permit set forth above. The DMRs set out the most stringent numerical limitations contained in Parts A or B of the permit. Thus, EPA has also concluded that the most stringent numerical limitations in the permit are the legally applicable effluent limitations.

The inconsistencies defendant claims, therefore, are not material disputed facts precluding summary judgment.

Defendants attempt to manufacture disputed facts is an effort to evade the clear procedure envisioned by Congress. As discussed earlier, the FWCPA represents a major departure in water pollution abatement strategy. In the Act, Congress turned away from direct regulation of water quality and established a NPDES as a means to improve water quality indirectly, by regulating effluent levels. This approach was intended to achieve "swift and direct" enforcement based on "simple numerical standards". *See Student Public Research Group v. Georgia-Pacific Corporation,* 615 F.Supp. 1419, 1430 (1985) (D.N.J., J. Brotman) *citing Corn Refiners Association v. Costle,* 594 F.2d 1223, 1226 (8th Cir.1979). *See also* 44 Fed.Reg. 3263.

"Courts interpreting the Act have been very reluctant to limit the legal effect of permit violations revealed in DMRs. For instance, defendants may not avoid summary judgment as to liability under the Act simply by challenging the accuracy of the data set forth in DMRs." *Georgia Pacific, supra, citing SPIRGNJ v. Tenneco Polymers,* 602 F.Supp. 1394, 1400 (D.N.J.1985); *Chesapeake Bay Foundation v. Bethlehem Steel,* 608 F.Supp. 440, 452 (D.Md. 1985); *Sierra Club v. Simkins Industries, Inc.,* 617 F.Supp. 1120, 1127–1128 (D.Md. 1985); *SPIRGNJ v. Fritzsche, Dodge & Olcott,* 579 F.Supp. 1528, 1538–1539 (D.N.J.1984); *aff'd,* 759 F.2d 1131 (3rd Cir.1985). *But cf. Friends of the Earth v. Facet Enterprises,* 618 F.Supp. 532, 536 (W.D.N.Y.1984).

 Because the issue here is whether the DMRs were violated and not the appearance of defendant's facility, I deny defendant's request for a site visit by the court.

## SUMMARY JUDGMENT

As stated earlier, summary judgment may only be granted where after all rea-

sonable inferences are drawn in favor of the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

██ Here, defendant has admitted in official reports that its discharges have exceeded the effluent limitations in its permit. The courts have long approved the use of report or records which the law requires to be kept as admissions in establishing civil liability. *See Garner v. United States*, 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976); *Shapiro v. United States*, 335 U.S. 1, 17, 35, 68 S.Ct. 1375, 1384, 1393, 92 L.Ed. 1787 (1948); *Environment Defense Fund, Inc. v. Lamphier*, 714 F.2d 331, 339 (4th Cir.1983). This rule has been specifically applied to reports required by the FWPCA. *See United States v. Ward*, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980).

As discussed earlier, the law is clear that a discharger whose effluent exceeds its permit limitations and who does not have a valid defense to the violation violates the Act.

The courts have held that NPDES enforcement actions are based on strict liability and that defendant's intent and good faith are irrelevant to the issues of statutory violations and the defendant's liability. *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th Cir.1979); *United States v. Frezzo Brothers, Inc.*, 17 ERC 2037, 2043–2044 (E.D.Pa.1982) (criminal penalties); *United States v. CF Industries, Inc.*, 542 F.Supp. 952, 955 (D.Minn.1982). *See also United States v. Phelps Dodge Corp.*, 391 F.Supp. 1181, 1187–1188 (D.Ariz.1975). If a defendant had made good faith efforts to comply, this may only be considered in assessing the amount of the penalty for which it is liable and in determining what other relief is appropriate.

As there is no dispute of material fact concerning defendant's violations of its permit limitations, the court will grant summary judgment as to liability to plaintiffs.