**UNITED STATES of America and Commonwealth of Pennsylvania, Plaintiffs,**

v.

**The MUNICIPALITY OF PENN HILLS, Defendant.**

**Civil Action No. 91–1334.**

United States District Court, W.D. Pennsylvania.

Feb. 18, 1998.

Robert L. Eberhardt, U.S. Attorney's Office, Pittsburgh, PA, Lynn Dodge, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, James J. D'Alessandro, U.S. Environmental Protection Agency, Philadelphia, PA, Daniel Palmer, U.S. Environmental Protection Agency, Washington, DC, for U.S.

Bruce M. Herschlag, Zelda Curtiss, Office of Chief Counsel, Pittsburgh, PA, for Com. of Pennsylvania Department of Environmental Resources.

August C. Damian, Solicitor, Damian & DeLuca, Pittsburgh, PA, Robert P. Ging, Jr., Confluence, PA, for Municipality of Penn Hills.

## MEMORANDUM OPINION

BLOCH, District Judge.

Presently before the Court is a motion filed by the plaintiff, the United States of America (the government), for summary judgment on the liability portions of Counts I and II of the Complaint. For the reasons set forth in this Court's opinion, the government's motion will be granted in part and denied in part.

### I. Background

This is a civil action seeking injunctive relief and civil penalties for alleged violations of the Clean Water Act (the Act), 33 U.S.C. § 1251, *et seq.* A brief rendition of the facts

underlying the within action is set forth below.

Defendant, Penn Hills, is a municipality in Allegheny County, Pennsylvania. As such, Penn Hills owns and operates five sewage collection and treatment plants, four of which are the subject of this action—the Gascola Water Pollution Control Plant (Gascola), the James Volk, or Sandy Creek, Water Pollution Control Plant (Sandy Creek), the Long Road Water Pollution Control Plant (Long Road) and the Plum Creek Water Pollution Control Plant (Plum Creek).

Penn Hills' collection and treatment process at the time the within action was filed was as follows: Raw sewage from the residences and businesses in Penn Hills was conveyed to one of Penn Hills' five collection and treatment plants either by gravity or through pump stations. Thereafter, once at the appropriate plant, the raw sewage underwent primary and secondary treatment, and the treated wastewater generated by each plant was then chlorinated and discharged through a permitted outfall. Often times, the wastewater was discharged directly into the Allegheny and Monongahela Rivers and their tributaries.

Section 301(a) of the Act, 33 U.S.C. § 1311(a), makes it unlawful for any person to discharge any pollutant except as in compliance with the Act. One exception to the Act's prohibition against discharge is found in § 402, 33 U.S.C. § 1342. Pursuant to that section, a person may obtain a permit under the National Pollutant Discharge Elimination System (NPDES), authorizing he or she to discharge certain pollutants under specified circumstances.

Most NPDES permits contain both effluent and bypassing limitations. Effluent limitations are restrictions placed on the quantity, rate and concentration of chemical, physical and/or biological constituents discharged by a permittee from designated point sources into navigable waters. Bypass limitations, on the other hand, are simply restrictions placed on the diversion of waste from a permittee's treatment facilities.

In June, 1985, and thereafter in June, 1990, Penn Hills obtained NPDES permits from the Pennsylvania Department of Environmental Resources. These permits were requested and obtained under the express authority of the Act, 33 U.S.C. § 1342(b), and, among other things, allowed Penn Hills to discharge pollutants into the Allegheny and Monongahela Rivers and their tributaries. Pursuant to the NPDES permit language, however, Penn Hills was required to take samples of and analyze the level of pollutants being discharged from each of the four treatment plants at issue, and was prohibited from discharging pollutants in concentrations in excess of the effluent limits set forth therein. (*See* Penn Hills' NPDES permits, part (A)(1), attached as Exhibits 1A–4C to the government's memorandum).

In addition to setting effluent limitations, the NPDES permits at issue also prohibited Penn Hills from bypassing waste unless the circumstances were such that: (1) bypassing was unavoidable to prevent loss of life, personal injury or severe property damage; and (2) no feasible alternative was available. Specifically, on the issue of bypassing, Penn Hills' NPDES permits provided as follows:

(1) *Bypassing not Exceeding Permit Limitations*—The permittee may allow any bypass to occur which does not cause effluent limitations to be exceeded, *but only if* the bypass is for essential maintenance to assure efficient operation....

(2) *Other Bypassing*—In all other situations bypassing is prohibited unless the following conditions are met:

(a) A bypass is *unavoidable to prevent loss of life, personal injury or "severe property damage"*; [and]

(b) There are *no feasible alternatives to a bypass,* such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. (This condition is not satisfied if the permittee could have installed adequate backup equipment to prevent a bypass which occurred during normal periods of equipment downtime or preventive maintenance) ....

(*See* NPDES permits, part (B)(1)(d)).

In August, 1991, the government filed the within complaint against Penn Hills, seeking

both injunctive relief and civil penalties for alleged violations of its NPDES permits and §§ 301 and 402 of the Act. Upon filing the complaint, the government also moved for a preliminary injunction, requesting that Penn Hills be ordered to perform certain activities designed to eliminate the alleged violations that were the most immediate threats to human health, i.e., the unauthorized discharge of raw sewage into the Allegheny and Monongahela Rivers and their tributaries.

Thereafter, in September, 1991, this Court issued a preliminary injunction order, consented to by all parties, requiring Penn Hills to, *inter alia:* (1) identify all points of unpermitted discharge; (2) monitor those discharge points; (3) produce and implement a plan to eliminate unpermitted discharge; and (4) immediately block the unpermitted discharge points that could be blocked. The Court also set forth a timetable for Penn Hills to comply with in the development and implementation of a comprehensive plan to rehabilitate its treatment facilities and/or to convey its sewage to the Allegheny County Sanitary Authority (Alcosan) for ultimate treatment.

Although Penn Hills encountered some delays in construction due to harsh weather conditions, and was therefore unable to meet several milestone dates set by this Court by which certain stages of the rehabilitation project were ordered to be completed, by January, 1996, Penn Hills was in compliance with all of the requirements of this Court's preliminary injunction order. That is, Penn Hills developed a comprehensive plan for conveying all of its raw sewage to Alcosan, and also developed a state of the art system of flow equalization tanks for the retention of excess sewage.

The only remaining relief sought by the government in this case is, therefore, permanent injunctive relief and the imposition of civil penalties.[1] Although the parties engaged in further settlement negotiations after the completion of Penn Hills' rehabilitation project, they have been unable to reach a final settlement of this matter. The government has therefore filed the motion presently before the Court in which it requests summary judgment on the liability portions of Counts I and II of the complaint. The Court will address the government's motion below.

## II. Summary Judgment Standard

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Indeed, "Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden is on the party moving for summary judgment to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.) (en banc), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Moreover, when considering a motion for summary judgment, this

---

1. While the penalty portion of this action is not being addressed in this motion, the Court recognizes, for the record, that it is indeed authorized to impose a civil penalty against a municipality such as Penn Hills where said municipality has violated the Act. *See* 33 U.S.C. § 1319(d). Specifically, on this issue, the Act provides as follows:

   Any person who violates...any permit condition or limitation...shall be subject to a civil penalty not to exceed $25,000 per day for each violation. In determining the amount of a civil penalty the court shall consider the seriousness

of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d). It should be noted, however, that because the maximum allowable daily penalty was increased from $10,000 to $25,000, effective February 4, 1987, the Court may not impose a penalty in excess of $10,000 per day for any violation occurring prior to that date.

Court must examine the facts in a light most favorable to the party opposing the motion, which, is this case, is Penn Hills. *International Raw Materials, Ltd. v. Stauffer Chemical Co.,* 898 F.2d 946, 949 (3d Cir.1990).

### III. Discussion

In Count I of the Complaint, the government alleges that "[o]n numerous occasions from at least 1986 through the present, Penn Hills has discharged raw or partially treated sewage from bypasses into the Allegheny and Monongahela Rivers and their tributaries without a permit for these discharges and without falling within the conditions required by the NPDES for bypassing outlined in the NPDES permit," in violation of § 301 of the Act, 33 U.S.C. § 1311. (*See* Complaint, ¶ 18).

Likewise, in Count II, the government alleges that "[o]n numerous occasions from at least 1986 through the present, Penn Hills has discharged pollutants from its facilities into the Allegheny and Monongahela Rivers and their tributaries in amounts exceeding the effluent limits in the applicable NPDES permits for fecal coliform, pH, ammonia-nitrogen, suspended solids, and biological oxygen demand," in violation of §§ 301 and 402 of the Act, 33 U.S.C. §§ 1311 and 1342. (*See* Complaint, ¶ 21).

The government has moved for summary judgment on the liability portions of these counts, arguing that there is no genuine issue of material fact with regard thereto. For the reasons set forth below, the Court agrees, in part.

■ In order to establish the liability of Penn Hills for a violation of its NPDES permits, the government must prove each of the following elements: (1) that Penn Hills is a "person" within the meaning of the Act; (2) that Penn Hills is or was in violation of a permit condition issued pursuant to the Act; and (3) that Penn Hills does not have a valid defense. *See* 33 U.S.C. §§ 1319(a)(3) and (b); *Student Public Interest Research Group of New Jersey, Inc. v. P.D. Oil & Chemical Storage, Inc.,* 627 F.Supp. 1074, 1090 (D.N.J.

1986) ("the law is clear that a discharger whose effluent exceeds its permit limitations and who does not have a valid defense to the violation violates the Act."). As set forth below, all three of these elements have been proven.

### A. Penn Hills is a "person"

■ As to the first element, Penn Hills admits in its Answer that it is a political subdivision of the Commonwealth of Pennsylvania and, thus, a municipality within the meaning of § 502(4) of the Act, 33 U.S.C. § 1362(4).[2] (*See* Answer, ¶ 1). Section 502(5) of the Act defines "person" as "an individual, corporation, partnership, association, State, *municipality,* commission, *or political subdivision of a State,* or any interstate body." 33 U.S.C. § 1362(5) (emphasis added). It is therefore without question that Penn Hills is a "person" within the meaning of the Act.

### B. Penn Hills violated its NPDES permits

A determination as to the second element above—that is, that Penn Hills is or was in violation of a permit condition issued pursuant to the Act—requires a more detailed analysis. First, as indicated above, Penn Hills was issued NPDES permits in 1985, and again in 1990, under the express authority of the Act, 33 U.S.C. § 1342(b). This much is clear. Moreover, Penn Hills does not appear to dispute the fact that it indeed discharged pollutants in concentrations in excess of the effluent limits set forth in its NPDES permits and/or that it discharged raw or partially treated sewage through bypasses, as alleged in Counts I and II of the Complaint.

■ Regarding bypassing, however, Penn Hills does dispute the validity of the government's argument that its use of bypasses was unauthorized under the terms of its NPDES permits. Specifically, Penn Hills first contends that its use of bypasses prevented hydraulic overloading, plant washouts and/or property damage, within the meaning of its

---

**2.** "The term 'municipality' means a city, town, borough, county, parish, district, association, or other public body created by or pursuant to State law and having jurisdiction over disposal of sewage, industrial wastes, or other wastes...." 33 U.S.C. § 1362(4).

NPDES permits. (*See* NPDES permits, part (B)(1)(d)). Second, Penn Hills contends that, prior to this litigation, there were no feasible alternatives to the bypasses being used at Penn Hills' plants. (*See* NPDES permits, part (B)(1)(d)).

Penn Hills contends that the use of equalization tanks was not a feasible alternative to bypassing because, prior to this Court's preliminary injunction order, it did not have authorization to construct such tanks. On this issue, Penn Hills states as follows:

> Prior to the entry of the September 23, 1993 Order of this Court the Department of Environmental Protection had not authorized the construction of such facilities in any permit issued to Penn Hills, and Penn Hills would have been precluded from constructing such facilities without authorization by the Department of Environmental Protection.

(*See* Penn Hills' response, ¶ 7). Penn Hills further contends that the conveyance of raw sewage to Alcosan was not a feasible alternative to bypassing because, prior to this litigation, such conveyance was not authorized.

In sum, Penn Hills contends that its use of bypasses was authorized under the term of its NPDES permits because any bypass alternative would have caused greater environmental harm and property damage than the bypasses themselves were causing. The Court is unpersuaded by Penn Hills' arguments in this regard.

As discussed more fully above, Penn Hills constructed a state of the art system of flow equalization tanks for the retention of excess sewage, and developed a comprehensive plan for conveying all of its raw sewage to Alcosan, both of which are clearly alternatives to the bypasses being used by Penn Hills up until the time of this litigation. Although Penn Hills contends that it was not authorized to take such actions prior to this Court's preliminary injunction order, Penn Hills neglects to mention the fact that, at any time, on its own initiative, it could have filed applications for and obtained authorization from the appropriate authorities for the rehabilitation and/or upgrading of its treatment plants. It did not do so.

The Court recognizes that the measures taken by Penn Hills in this case to rehabilitate its sewage treatment system were indeed costly. Nevertheless, the Court finds that the above alternatives were feasible within the meaning of Penn Hills' NPDES permits. (*See* NPDES permits, part (B)(1)(d)) ("bypassing is prohibited unless...there are no feasible alternatives to a bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment down-time."). Therefore, unless it has a valid defense, the Court will hold Penn Hills liable for any and all effluent and/or bypassing violations that it committed in this case. *See* 33 U.S.C. § 1319(a)(3) and (b).

### C. Penn Hills has no valid defense

In order to make a determination as to the third condition above—that is, that Penn Hills has no valid defense—the Court must look to the affirmative defenses raised by Penn Hills in its Answer. The Court will address each of these affirmative defenses below.

Penn Hills' first affirmative defense is that the United States failed to join the Commonwealth of Pennsylvania in this action, an alleged necessary and indispensable party. However, because the Commonwealth of Pennsylvania intervened in this matter by Complaint in Intervention in January, 1992, Penn Hills' first affirmative defense is moot.

Penn Hills' second affirmative defense is that some portions of the government's claims are barred by the statute of limitations. The statute of limitations governing suits for civil penalties under the Act provides, in pertinent part, that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued..." 28 U.S.C. § 2462; *see also Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 73–74 (3d Cir. 1990) (applying five year limitations period to action brought under the Act), *cert. denied,*

498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991).

■ In this case, the government filed its complaint against Penn Hills on August 7, 1991, and, for purposes of the Act, "the five year statute of limitations period does not begin to run until the DMRs listing the violations are filed."[3] *See Powell Duffryn*, 913 F.2d at 75. Thus, as the government concedes, any violations evidenced by DMRs filed by Penn Hills prior to August 7, 1986, are indeed time-barred. However, any violations evidenced by DMRs filed by Penn Hills on or subsequent to August 7, 1986, are timely, even if the violations evidenced therein occurred prior to that date. The Court will take this into consideration at the time of trial.

■ Penn Hills' third affirmative defense is that this Court lacked jurisdiction to enter a preliminary injunction. The Court disagrees. Under the express authority of the Act, the Court was clearly authorized to grant preliminary injunctive relief to the government in this case. Indeed, the Act provides, in pertinent part, as follows:

> The Administrator is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a) of this section. Any action under this subsection may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and *such court shall have jurisdiction to restrain such violation and require compliance.*

33 U.S.C. § 1319(b) (emphasis added).

■ Penn Hills fourth affirmative defense is that any penalty assessed by this Court would inappropriately penalize the taxpayers. The Court, however, has already made the parties fully aware of its stance on this issue. Indeed, the Court stated the following at an April 29, 1994 hearing in this matter:

I have received a number of letters from citizens of Penn Hills basically asking me don't punish the taxpayers, punish the politicians. The residents of Penn Hills elected those who are supervising. This isn't going to be an excuse, that the politicians did it and we didn't. These are the elected and appointed representatives of the residents of Penn Hills and the residents of Penn Hills are going to have to bear the brunt of their misdeeds and remove those people one way or the other if they are not doing their job.

(*See* Transcript of Hearing, April 29, 1994).

Penn Hills' fifth affirmative defense is that the Plum Creek plant is actually operated under a cooperative agreement with Plum Borough, a municipal corporation of the Commonwealth of Pennsylvania, as a result of an enforcement action taken against Penn Hills by the Department of Environmental Resources. For this reason, Penn Hills argues that it should not be held liable for any violations that may have occurred at the Plum Creek plant. Contrary to Penn Hills' assertions, however, it is clear that the actual owner and operator of the Plum Creek plant is Penn Hills, and not Plum Borough. Indeed, Penn Hills is the holder of the NPDES permit which authorizes it, and not Plum Borough, to discharge pollutants from the Plum Creek plant.

Penn Hills' sixth affirmative defense is that it is permitted, under the terms of its NPDES permits, to discharge pollutants into the navigable waters of the United States. As discussed above, however, Penn Hill's NPDES permits only allow it to discharge pollutants under specified circumstances, i.e., where no feasible alternatives exist. This Court has already found that feasible alternatives to bypassing were available to Penn Hills prior to this litigation.

Penn Hills' seventh and final affirmative defense is that, by operating a sewage treatment system, Penn Hills prevents the direct discharge of pollutants into the navigable waters of the United States, and, thus, actu-

---

3. NPDES permittees such as Penn Hills are required to submit Discharge Monitoring Reports, or DMRs, to state and/or federal environmental agencies, providing those agencies with informa-

tion regarding the monthly flow of pollutants through their treatment plants and the results of sampling and analysis conducted on the discharge levels from each plant.

ally reduces the harm to the environment and to the public health and welfare that is alleged in the Complaint. This is not a valid defense. As discussed more fully above, Penn Hills clearly did not prevent the discharge of pollutants into the Allegheny and Monongahela Rivers and their tributaries in this case, but, rather, caused such discharge to occur.

### IV. Conclusion

In conclusion, because the government has proven that Penn Hills is indeed a "person" within the meaning of the Act, that Penn Hills is or was in violation of a permit condition issued pursuant to the Act, and that Penn Hills does not have a valid defense, the Court finds that Penn Hills is liable at Count I for diverting raw sewage from its treatment facilities, in violation of § 402 of the Act, 33 U.S.C. § 1342. For these same reasons, the Court further finds that Penn Hills is liable at Count II for discharging pollutants at authorized discharge points in concentrations in excess of the applicable effluent limitations set forth in its NPDES permits, in violation of §§ 301 and 402 of the Act, 33 U.S.C. §§ 1311 and 1342. To this extent, the Court is granting the government's motion for summary judgment on the liability portions of Counts I and II of the complaint.

The government has requested summary judgment as to a specific number of NPDES permit violations allegedly committed by Penn Hills in this case. Indeed, the government contends that Penn Hills' DMR reports show that it committed 13,103 violations of the effluent limitations set forth in its NPDES permits and 311 violations of the bypassing limitations. Without the aid of an expert, however, the Court is unable to determine, as a matter of law, just how many effluent and bypassing violations are evidenced by Penn Hills' DMR reports. The Court will, therefore, defer such a determination until the time of trial.